IN THE UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY S. KUDLA, | ) | Case No. 5:21-CV-00349 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES R. KNEPP |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| KENNETH BLACK, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | **AND ORDER** |

A jury found our petitioner, Gregory Kudla, guilty of raping and committing gross sexual imposition against his oldest daughter, B.M.K., on several occasions from April 2005 until April 2014.  Additionally, the jury found Kudla guilty of showing his juvenile daughter obscene materials.  *See State v. Kudla*, 2016-Ohio-5215, at ¶¶ 2-4 (Ct. App.); *State v. Kudla*, Case No. CR-2014-05-1461, Summit County Court of Common Pleas.  The trial court imposed an aggregate sentence of 42 ½ years in prison.  *See* ECF Doc. 6-1 at 101-104.

Kudla petitions for writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions in *State v. Kudla*.  ECF Doc. 1.  Kudla raises four grounds for relief:

**GROUND ONE:** Ineffective Assistance of Appellate Counsel (IAAC).

**GROUND TWO:** (Under IAAC) The trial court erred on two different occasions when it allowed, over objection, impermissible expert testimony which, directly or indirectly, improperly bolsters the credibility of the alleged victim to the prejudice of the defendant in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

**GROUND THREE:** (Under IAAC) The trial court erred to the prejudice of the defendant when it permitted the State to introduce testimony pertaining to

additional discovery [disclosed] via email beyond the 21-day requirement of
Crim.R.16(k) and Evid.R.403(A) in violation of the Fifth, Sixth, and Fourteenth
Amendments of the United States Constitution.

**GROUND FOUR:** (Under IAAC) The defendant was denied effective assistance
of counsel and a fair trial when the video interview of the alleged victim with
police was introduced without an expert to provide the jury with relevant
information to make an educated determination of evidence "sufficiently beyond
common experience," in violation of the Fifth, Sixth, and Fourteenth
Amendments [to the] U.S. Constitution.

ECF Doc. 1 at 5-10.  Additionally, Kudla has filed a motion to expand the record to include trial

exhibits, which he contends would further explain the errors he asserts occurred during his trial

proceedings.  *See* ECF Doc. 9.

## I.   State Court Proceedings

### A.   Trial Court

#### 1.   Indictment

On May 23, 2014, a Summit County grand jury indicted Kudla on eight counts of raping

B.M.K. (Counts 1 to 8), alleging that he raped B.M.K. twice each year from April 2010 to April

2014; eight counts of sexual battery (Counts 9 to 16), which were based on the same conduct as

the rape counts; five counts of gross sexual imposition (Counts 17 and 21) occurring once a year

from April 2005 through April 2009; and one count of disseminating matter harmful to juveniles

(Count 22).  ECF Doc. 6-1 at 6-13.  Kudla retained counsel and pleaded not guilty.  ECF

Doc. 6-1 at 14.  On December 10, 2014, the State of Ohio dismissed one count of gross sexual

imposition (Count 21), and the charge of disseminating matter harmful to juveniles was

renumbered to be Count 21.  ECF Doc. 6-1 at 15.

#### 2.   Trial

On November 18, 2014, the case proceeded to trial.  *See* ECF Doc. 6-3 at 6.  The

evidence presented at trial, as described by the Ohio Court of Appeals, was as follows:

2

[*P4] A jury ultimately heard this matter and found Mr. Kudla guilty on all 16 counts of rape and sexual battery.  The jury also found him guilty of disseminating matter harmful to juveniles and of committing gross sexual imposition between April 2008 and April 2009. . . .

[* * *]

[*P21] B.M.K. testified that she was born in April 1996.  When she was between 8 and 15 years of age, B.M.K. resided in Macedonia with her father, her three younger siblings, and, initially, her mother.  She testified that she did not have a close relationship with her mother, but was always very close with her father.  B.M.K.'s mother, Jennifer Kudla, resided at the family's Macedonia home until B.M.K's freshman year of high school.  Ms. Kudla then moved elsewhere, but came to the house in the mornings to help the children prepare for school.  In March 2012, shortly before B.M.K. turned 16, B.M.K., her father, and her siblings moved to a new residence in Twinsburg.  Meanwhile, Ms. Kudla continued to reside elsewhere.

[*P22]  B.M.K. testified that, when she was a small child, she cuddled with her father and sat on his lap.  She remembered that she was in sixth grade the first time that her father touched her sexually.  B.M.K. recalled lying next to her father and watching television in the basement of their Macedonia home when he began caressing her genitals over her clothes.  From that point forward, B.M.K. testified that her father would touch her more than once a month.  She testified that he primarily touched her while the two were in the basement and that his touching gradually increased until he was placing his hands under her clothes and touching her vagina.

[*P23]  B.M.K. testified that, as she got older, she became curious about the physical changes taking place in her body and started asking her father questions.  In seventh or eighth grade, B.M.K. asked Mr. Kudla about sexual intercourse.  According to B.M.K., her father then asked her if she wanted to know what happened during intercourse, and she said yes.  She testified that her father took her downstairs on his birthday, removed his pants, removed her clothing, and had vaginal intercourse with her for the first time.  B.M.K. stated that it hurt when her father penetrated her and she told him so.  Mr. Kudla then told her that the pain "was normal and it was okay" and "took it slow."  After she indicated that it hurt more, however, her father stopped.

[*P24]  B.M.K. testified that, after her father had sex with her, he digitally penetrated her vagina and had oral sex with her several times while she and her family were still residing at their Macedonia residence.  Additionally, her father asked her to perform fellatio on one occasion and purchased a vibrator for her.  B.M.K. stated that her father instructed her to use the vibrator "if [she] ever felt like [she] needed to."  She also stated that two or three times her father attempted to show her pornography on his computer.  She described the pornography as

3

"[o]ther people having sex," but stated that she would look away when her father tried to show it to her because she did not want to watch.  According to B.M.K., all of the foregoing acts occurred while her mother was still residing at the Macedonia home with them.  She testified that, after her mother moved out, her father touched her more frequently.

[*P25]  Once Mr. Kudla moved his family to Twinsburg, B.M.K. testified that he would have vaginal intercourse with her on an almost nightly basis.  She testified that the two would always have sex in her father's bedroom with the door closed and locked while he played loud music on his computer.  B.M.K. indicated that her younger sister's bedroom was diagonal to her father's bedroom, but that he would have sex with her at around 10 or 11 o'clock at night after her younger siblings had gone to bed.  She testified that her father purchased two more vibrators for her after they moved to Twinsburg and that she would use them in his presence because "[h]e wanted me to cum."  B.M.K. stated that her father digitally penetrated her vagina and had vaginal intercourse with her multiple times per year until she turned 18.  She testified that her father told her not to tell anyone about their sexual relationship because "society doesn't rule you, and * * * they shouldn't be telling you what to do in your personal life."

[*P26]  B.M.K. agreed that she was afraid of her father when he was angry because he would yell and "his face would get all red."  She testified that her father and her younger sister, B.R.K., had a strained relationship and that things sometimes got physical when B.R.K. disobeyed him.  B.M.K. saw her father throw her sister across the room and into a wall hard enough to make her start crying.  She also saw him throw B.R.K. into the stairs.  B.M.K. testified that she had sexual intercourse with her father because she "knew what would happen if [she] didn't."  She stated that her father had threatened to take away her phone as well as the special privileges she enjoyed.  She testified that she wanted the sexual activity to stop back when they lived in Macedonia and that she told her father it "wasn't normal," but that he continued to have sex with her.  She stated that her father never held her down or specifically threatened her, but that "[s]ometimes [the sexual conduct] was forced" because she "would tell him that [she] didn't want to do it."

[*P27]  B.M.K. testified that she did not want to disclose her father's sexual abuse because she "didn't want [her] brothers to grow up without a father."  She admitted that she still loved her father and had not wanted him to get into trouble.  She testified that her mother suffered from mental health issues and that she had basically raised her younger siblings alongside her father.  B.M.K. admitted that she hated her younger sister for disclosing the sexual abuse because she thought her sister had "ruined [their] family."

[*P28]  B.R.K., B.M.K.'s younger sister, testified that her sister and their father were always very close and that Mr. Kudla favored B.M.K.  She specified that her father would take B.M.K. places or buy her things, but that he would not do so for

4

his other children.  She described herself as having a contentious relationship with her father and testified that her father would always ground her, take away her things, and scream at her.  She testified that, on one occasion when they still lived in Macedonia, her father pinned her down on the bed and fondled her chest while she screamed and B.M.K. watched.  On a different occasion, her father threw her across the room and kicked her hard enough to leave a bruise.  B.R.K. testified that, on the occasion that gave rise to her disclosure of her sister's abuse, her father kicked down the door to the bathroom where she was taking a shower, screamed at her, and slapped her across the face.  According to B.R.K., she was afraid to tell anyone what things were like at home because her father "always said that he was above the law and no matter what [she] said it wouldn't have mattered."  She also testified that B.M.K. "would never have said anything because she was terrified of [their father]."

[*P29]  Dr. Cynthia Keck-McNulty, a mental health therapist/trauma specialist at Akron Children's Hospital, testified at trial regarding her treatment of B.M.K. and the grooming process that sexual predators use to perpetrate abuse.  She explained that, when grooming a child, a predator will typically select a child with low self-esteem and begin providing them with special treatment.  According to Dr. Keck-McNulty, that special treatment can come in the form of extra attention, special trips, gifts, or other treats.  The perpetrator elevates the child and cultivates a special relationship with them before beginning to introduce a sexual element.  Dr. Keck-McNulty testified that the perpetrator may begin by touching the child in increasing amounts or by showing the child inappropriate viewing materials such as pornography.  She testified that the child may recognize that the new elements of the relationship are wrong, but will ultimately accept them because the child has become dependent upon the affection and attention that the predator has shown them.  She further testified that the predator will stress secrecy with the child and "make[] it very well known to [the] child * * * that other people wouldn't understand" and that disclosing the abuse would result in the child getting into trouble and the loss of the special attention upon which the child has come to rely.  According to Dr. Keck-McNulty, such abuse can go on for years before disclosure occurs because the children the predators select "have a low self-esteem and they don't get a lot of attention or positive stuff from other adults or other people and so they're not about to give that up."

[*P30]  Dr. Keck-McNulty testified that Mr. Kudla's representation to B.M.K. that their relationship was special and that society should not interfere in one's personal affairs was consistent with grooming behavior.  It was her impression that B.M.K. was torn between loving her father and feeling betrayed by his manipulation.  She explained that Mr. Kudla had cultivated a very close relationship with B.M.K. and had given her special privileges, but otherwise kept her on a very strict schedule.  B.M.K. was responsible for caring for her younger siblings, overseeing the chores in the house, and doing the grocery shopping.  B.M.K. told Dr. Keck-McNulty that Mr. Kudla would not allow her to cheerlead because boys would look at her and would not allow her to play volleyball

because he did not permit spandex clothing.  B.M.K. also told her that Mr. Kudla would not allow her to date and that, when she once tried to date a boy at the age of 15, "her dad put an end to that right away and she never tried again." Dr. Keck-McNulty testified that B.M.K. admitted that she was afraid of her father because she had seen what he could do to her younger sister.

[* * *]

[*P38]  Laila Menas testified that she began spending time with Mr. Kudla and his family because their daughters played soccer together.  She testified that she dated Mr. Kudla from 2009 to mid-2012 and, during that time, was able to closely observe him interact with his children.  She stated that Mr. Kudla and B.M.K. had a "very inseparable relationship" and that he was much closer to her than to the rest of his children.  She indicated that he and B.R.K. had a poor relationship and that B.M.K. and B.R.K. did not get along.  According to Ms. Menas, B.R.K. frequently stayed at her house and both Mr. Kudla and B.M.K. would ask her to keep B.R.K. because they did not like her.

[*P39]  Ms. Menas testified that, near the beginning of her relationship with Mr. Kudla, he brought the children over to her house and appeared to be very upset.  When she insisted that he tell her what was wrong, Mr. Kudla indicated that his estranged wife had accused him of molesting B.M.K.  Mr. Kudla explained that his wife had found him sleeping in B.M.K.'s bedroom with the door locked.  According to Ms. Menas, Mr. Kudla told her that he was sleeping in the room because he did not want his estranged wife attempting to have sex with him when she "would come home drunk from being out all night[.]"

[*P40]  Ms. Menas testified that, near the end of her relationship with Mr. Kudla, he discovered that B.M.K. had been dating a boy.  She testified that he became very emotional and described it as a betrayal.  Ms. Menas described the discovery as the catalyst that ended her relationship with Mr. Kudla.  She testified that Mr. Kudla asked to stop the relationship in order to focus on his children. According to Ms. Menas, Mr. Kudla told her that "if he wasn't distracted with our relationship [B.M.K.] would have never needed a boyfriend."

[*P41]  B.R.K. testified that B.M.K. and her father had a close relationship with one another, but that she did not get along with either of them.  She stated that B.M.K. and her father were "always alone together" and it "would seem like they were keeping secrets."  After the family moved to Twinsburg, the time that they spent together increased.  B.R.K. testified that the two frequently cuddled on the couch and would lie on top of one another under a blanket.  She stated that they would stay up late at night and sometimes they would check to make sure everyone was asleep "before they went in his room * * * and you could hear the door lock."  B.R.K. described her bedroom as being at an angle from her father's bedroom such that she could see his bedroom door from her bed.  She testified that, on at least one occasion, she saw her sister carrying a purple dildo into their

6

father's bedroom. She stated that loud music would play after her sister and her father went into his bedroom, but that the music still did not stop her from hearing the springs in the bed. B.R.K. indicated that the noise was very upsetting and that she started wearing headphones to sleep. Other times, B.R.K. testified, she was so upset by the situation in her home that she left the house and walked outside to get some fresh air.

[*P42]  B.R.K. testified that one of her nighttime ventures outside led to the police bringing her home. Mr. Kudla screamed at her as a result of that incident and removed the door to her room, telling her that she did not deserve privacy. B.R.K. testified that, approximately one week later, she missed the bus and was terrified to come home. She explained that her father sometimes physically injured her when he became angry and that he had started telling her that he was going to send her to a juvenile detention center because of her behavioral issues. She testified that, when she finally came home later, B.M.K. was there and told her that their father was out looking for her. B.R.K. decided to take a shower and was still in the bathroom when her father arrived back home. B.R.K. testified that Mr. Kudla broke through the bathroom door. She testified that he screamed at her and ended up slapping her across the face, leaving a bruise. Her father then left and did not come home for the remainder of the evening.

[*P43]  B.R.K. testified that she left for school early the following day. She did not have her cell phone that day because her father had taken it away, but she testified that she received text messages from her sister because her sister sent them to one of B.R.K.'s friends. B.R.K. testified that her sister's messages indicated that she should be careful when she came home because her father was "still furious" with her. She stated that she grew more and more upset until she finally broke down at lunch. When school officials confronted her, she admitted that her father had hit her the night before. She also disclosed the fact that she believed her father was having a sexual relationship with B.M.K. B.R.K. testified that she never told anyone about the things their father was doing before that day because she was afraid and he "always said that he was above the law and no matter what [she] said it wouldn't have mattered." She also stated that she did not think anyone would believe her because her father acted differently inside the house than he did when he was in public.

[*P44]  Following B.R.K.'s disclosure, she was taken to the Twinsburg Police Department and other officers went to the Kudla home to retrieve her siblings. Detective Mark Kreiger testified that he interviewed B.M.K. at the station until his supervisor, Lieutenant Scarl, came into the room and took over the interview. During B.M.K.'s cross-examination, the defense played a portion of her recorded interview with the police. The recording depicts B.M.K. in an emotional state, repeatedly denying an inappropriate relationship with her father. In the recording, she eventually admits being in her father's room at night on occasion, but tells Detective Kreiger that the door was never locked and that she and her father were reviewing soccer tapes together. She continues to deny any abuse until

Lieutenant Scarl enters the room and speaks with her. She then becomes extremely upset, pulling her shirt over her face and sobbing. After a short break, she admits that her father engages in sexual conduct with her, but casts their relationship as consensual. B.M.K. later testified that she said the acts were consensual because she thought that way her father would not get into trouble. She explained that she was trying to protect her father and keep her family from being torn apart.

[*P45]  The same day that the police interviewed B.M.K. and B.R.K. they executed a search warrant at their Twinsburg residence. Detective Kreiger aided in the search and testified that the police found a vibrator and several dildos in B.M.K.'s drawer where B.R.K. had told them they would be hidden. The police also confiscated several computers from the home, including a laptop from B.M.K.'s room, a desktop computer from the living room, and a desktop computer from Mr. Kudla's bedroom. Michael Dodson, a computer forensic specialist for the Bureau of Criminal Investigation ("BCI"), testified that he examined the computers after the police confiscated them. On the laptop taken from B.M.K.'s room, Dodson discovered pornographic video files. He testified that the laptop had several user profiles, one of which was "Dadio." He testified that all of the pornographic video files were located within the Dadio user profile.

[*P46]  Dodson also testified regarding the analysis he performed on the computer taken from Mr. Kudla's bedroom. He testified that the computer only had one profile labeled "Gregory." He discovered that someone performed searches on that computer for "STD, STD Facts and Chlamydia." His analysis also disclosed that, on March 16, 2014 and March 22, 2014, someone visited a website that offered testing packages for sexually transmitted diseases. He testified that the computer stored the personal information that had been entered into the fields of a form on that website. There was evidence that the stored personal information matched Mr. Kudla's business phone number and his email address. There also was evidence that B.M.K. tested positive for chlamydia when she was tested at Akron Children's CARE Center in late May 2014.

[*P47]  During his testimony, Mr. Kudla denied ever having chlamydia. He admitted that he had ordered testing kits before, but claimed that he did so for other men with whom he worked and for himself because he worried that his wife or some of the other women he had slept with might have infected him. The parties stipulated that Mr. Kudla tested negative for chlamydia on December 6, 2013, March 28, 2014, and July 23, 2014. They also stipulated, however, that Mr. Kudla waited more than seven weeks after the court ordered him to submit to testing before having the July 23rd test performed.

[*P48]  [ . . . ] Dr. Keck-McNulty explained the grooming process and testified that she began seeing B.M.K. and B.R.K. as patients following their disclosure of Mr. Kudla's abuse. She testified that when child sexual abuse occurs in a family with siblings, the victim will typically receive special treatment and special time

8

with the parent.  She testified that the other siblings will typically feel resentful of the fact that they appear to get into trouble more often and that the entire situation "creates a big divide between siblings and the family."

[*P49]  Dr. Keck-McNulty testified that B.M.K. initially did not want to meet with her.  She testified that B.M.K. was torn between loving her father and accepting that he had manipulated and abused her.  She stated that B.M.K. was worried to confront her father in court because "she was afraid she was going to freeze up and not be able to tell her story * * *."  When Dr. Keck-McNulty asked B.M.K. what she would like to see happen to her father, B.M.K. responded that she "just want[ed] him gone[.]"  Dr. Keck-McNulty testified that B.M.K. relayed having difficulty eating and sleeping.  She told Dr. Keck-McNulty that she would have nightmares about "what [her father] did and about him yelling."  Dr. Keck-McNulty testified that when B.M.K. tried to describe one of the dreams, she started to cry and was unable to continue.  Dr. Keck-McNulty testified that her observations of B.M.K., in conjunction with the information she received from B.R.K. and B.M.K.'s CARE Center interview and exam, were consistent with sexual abuse.

[*P50]  Jennifer Kudla, B.M.K.'s mother, testified that she stopped living with her family in 2010 because she and Mr. Kudla argued constantly and they decided it would be better for the family if they lived apart.  She testified that Mr. Kudla scared her because he would become angry very quickly and had an explosive temper.  She stated that they began sleeping apart the year before she moved out.  On one occasion, she went to wake B.M.K. for school and discovered that Mr. Kudla was inside her small bedroom with the door locked.  According to Ms. Kudla, when she asked Mr. Kudla why he was in there with the door locked, he claimed that he had locked himself inside and slept there because he was afraid she was going to kill him in his sleep.  She testified that the incident made her wonder whether her husband was abusing B.M.K. because he was always so affectionate toward her.

[*P51]  Plagued by her concerns, Ms. Kudla discussed the matter with someone in Mr. Kudla's family.  She testified that her husband eventually learned about that conversation and, when he found out, he "came after [her] and * * * broke down [her] bedroom door off of the hinges and scared the crap out of [her]."  She testified that Mr. Kudla also threatened to take the children away from her.  Ms. Kudla admitted that she suffered from mental health issues and testified that Mr. Kudla would use that against her, telling her that she was imagining things.  She testified that she confronted B.M.K. once in 2013 to ask if her father was sexually abusing her because B.R.K. had suggested that might be the case.  When B.M.K. denied the accusation, however, Ms. Kudla did not pursue it further by filing a formal police report.  She testified that she was afraid to file a report because she did not have hard evidence against Mr. Kudla and did not want to lose her children.

[*P52]  Mr. Kudla testified in his own defense and presented the testimony of Kelley Lube, a family friend, and Robert Kudla, his father.  Ms. Lube testified that she had a significant amount of interaction with Mr. Kudla and his children. According to Ms. Lube, Mr. Kudla treated all of his children the same and was a relatively lax father.  She testified that she never had any concerns about inappropriate behavior and that neither B.M.K., nor B.R.K. ever suggested that their father was abusing them in any manner.  Meanwhile, Mr. Kudla's father testified that he had a good relationship with his grandchildren and that they were usually well-behaved.  He also testified, however, that B.M.K. and B.R.K. suffered from sibling rivalry and that B.R.K. always upset the balance of the family because she was the jealous type and wanted the attention.

[*P53]  Mr. Kudla testified that he never touched B.M.K. in an inappropriate manner and never had sexual intercourse with her.  He testified that he and his estranged wife had relationship issues and that, in 2009, he discovered she was having an affair.  He then reduced his work hours and went to counseling with her, but ultimately started sleeping in a different room because things became so contentious.  Mr. Kudla stated that he had difficulty sleeping and set up booby traps because he was so concerned about his wife "offing [him] so she could take the kids."  According to Mr. Kudla, he slept in B.M.K.'s room once, at her suggestion, because he desperately needed sleep and the door had a lock on it.

[*P54]  Mr. Kudla testified that he would punish B.M.K. when she misbehaved, but that it was rare for her to have disciplinary issues.  Conversely, he stated that her sister, B.R.K., had "always been a handful" and described her as selfish and self-centered, like her mother.  He stated that he never intended to send B.R.K. to a juvenile detention center, but had researched a diversion program for her due to her falling grades and behavioral issues.  Mr. Kudla admitted that he slapped B.R.K. in the face the night before his arrest, but testified that he did so because he heard her say something to the effect of "[y]ou can go f*** yourself" while he was yelling at her.  He also admitted that he kicked down the bathroom door to get to B.R.K.  According to Mr. Kudla, he did so because B.R.K. did not answer when he pounded on the door and, given that she had been acting depressed, he was worried that she might be harming herself.

[*P55]  Mr. Kudla admitted that he had a bad temper was he was younger, but claimed that he no longer did.  He denied that he had ever physically harmed B.R.K. before the day that he slapped her.  According to Mr. Kudla, he tried to have a close relationship with all of his kids and "tried to be all equal but [B.R.K.] didn't want to participate in it."  He denied that he gave B.M.K. special treatment. Nevertheless, he admitted that he took B.M.K. kayaking during the school day, the day after he slapped B.R.K. and the same day that B.R.K. decided to disclose his abuse.  Mr. Kudla testified that B.M.K. asked to go kayaking that day, and he and his estranged wife mutually agreed that she could miss school because the water conditions were ideal.  Mr. Kudla also admitted to exchanging text messages about B.R.K. with B.M.K. when she and her sister went to Florida with

their grandparents.  In one of his messages, he told B.M.K. that he "was kind of hoping [B.R.K.] wouldn't make it back."  In another message, B.M.K. teased that everyone loved Mr. Kudla, with the exception of B.R.K., and he responded "F*** [B.R.K.], lol."  Mr. Kudla testified that the messages were simply meant as jokes.

*Kudla*, 2016-Ohio-5215, at ¶¶ 4, 21-30, 38-55.

### 3.  Sentencing

On December 10, 2014, following the jury's verdict finding Kudla guilty on all counts, the trial court held Kudla's sentencing hearing.  ECF Doc. 6-1 at 17.  The trial court found that Counts 9 to 16 for sexual battery were allied offenses of similar import to Counts 1 to 8 for rape and merged the sexual battery counts with the corresponding rape counts.  ECF Doc. 6-1 at 17. The trial court sentenced Kudla to five-year prison terms for each of the counts of rape (Counts 1 through 8); a two-year term for gross sexual imposition (Count 17); and a six-month term for disseminating matter harmful to juveniles (Count 21[1]).  ECF Doc. 6-1 at 17-18.  The trial court ordered the prison terms to be served consecutively, constituting an aggregate sentence of 42 ½ years' imprisonment.  ECF Doc. 6-1 at 19.

### B.  Direct Appeal

On May 7, 2015, Kudla, though counsel, filed a direct appeal.  ECF Doc. 6-1 at 21. Kudla's merits brief asserted four assignments of error:

**Assignment of Error One:** The trial court erred in instructing the jury on the definition of force as an element of the rape charges.

**Assignment of Error Two:** Appellant was denied the effective assistance of counsel at trial by the failure to object to the court's erroneous jury instruction and in the cummulative [*sic*] errors committed throughout the trial.

**Assignment of Error Three:** The evidence was insufficient to support the findings of guilty on the charges of rape.

---

[1] For sentencing purposes, the trial court renumbered Count 21 back to its original number of Count 22. ECF Doc. 6-1 at 17.

**Assignment of Error Four:** Appellant's convictions were against the manifest weight of the evidence.

ECF Doc. 6-1 at 33.  In his second assignment of error, Kudla identified trial counsel's decision to play B.M.K.'s interview with police as an additional error.  ECF Doc. 6-1 at 52.  The State filed an appellee brief.  ECF Doc. 6-1 at 65-98.  On August 3, 2016, the Ohio Court of Appeals overruled Kudla's assignments of error and affirmed his convictions.  ECF Doc. 6-1 at 105-134.

On September 19, 2016, Kudla appealed to the Ohio Supreme Court.  ECF Doc. 6-1 at 135-148.  Kudla's memorandum in support of jurisdiction asserted one proposition of law related to the trial court's special instruction on the definition of force as an element of rape. ECF Doc. 6-1 at 141.  The State indicated it would not be filing a response brief, unless requested by the Ohio Supreme Court to do so.  ECF Doc. 6-1 at 180.  On February 22, 2017, the Ohio Supreme Court declined jurisdiction.  ECF Doc. 6-1 at 181.

## C.  Application to Reopen Direct Appeal under Rule 26(B)

On October 28, 2016, while his appeal to the Ohio Supreme Court was pending, Kudla timely filed a pro se application to reopen his direct appeal under Rule 26(B).  ECF Doc. 6-1 at 182-191.  In it, Kudla argued that his appellate counsel had been ineffective for failing to raise "winning issues" on appeal.  ECF Doc. 6-1 at 184.  In his application, Kudla stated that:

> [I]t is Appellant's understanding that the App.R.26(B) Application is not necessarily the proper venue to argue and explore the full merits of any additional assignments of error that should have been included in the original appeal (nor is it practical considering the 10 page limit) but that this is what the appeal itself is for.  Therefore, Appellant's focus throughout this Application is to demonstrate ineffective assistance of appellate counsel per the criteria set forth in *Strickland, supra*.  In order to do this Appellant has included numerous exhibits in support of his argument that appellate counsel was deficient in adequately representing him because they failed to perform full and adequate due diligence with their "inquiry and analysis of the factual and legal elements of the problem" in preparing the previous appeal brief summited to this Honorable Court, and in adequately exploring other stronger assignments of error that were evident from the record.

12

ECF Doc. 6-1 at 185.

In his application, Kudla specifically pointed to the following as instances of his appellate counsel's ineffectiveness in preparing his direct appeal brief: (i) appellate counsel's failure to challenge the admissibility of hearsay testimony from Dr. Keck-McNulty; (ii) appellate counsel's failure to challenge trial counsel's decision to play B.M.K.'s interview with police; (iii) appellate counsel's failure to argue numerous instances of conflicting evidence; and (iv) appellate counsel's failure to challenge the admission of evidence made available within the 21-days for discovery in violation of Criminal Rule 16(K). ECF Doc. 6-1 at 187-190. Additionally, Kudla attached 25 exhibits totaling 385 pages, including state court records and his own memoranda further articulating his arguments. *See* ECF Doc. 6-1 at 192-577.

The State responded, contending that Kudla's application should be denied because "[t]he ten page limit cannot be evaded by marking arguments as exhibits." ECF Doc. 6-1 at 578. Kudla replied, stating "all of the arguments pertaining to the argument of ineffective assistance of appellate counsel [] are presented within the application itself," noting that his application specifically referenced four ways in which he argued his counsel was ineffective. *See* ECF Doc. 6-1 at 580, 582.

On January 27, 2017, the Ohio Court of Appeals denied Kudla's application finding that:

Within the ten pages of his actual application, however, he fails to assert any specific assignment(s) of error that were not previously considered or that were considered on an incomplete record. *See* App.R. 26(B)(2)(c), (3). Because Appellant's application does not comply with App.R. 26(B), it is denied.

ECF Doc. 6-1 at 587.

On December 4, 2017, Kudla filed a pro se motion for the Ohio Court of Appeal to reissue its decision on his Rule 26(B) application to reopen, asserting in relevant part that the clerk of courts failed to serve him with a copy of the order. ECF Doc. 6-1 at 588-591; *see also*

13

ECF Doc. 6-1 at 593-630.  The State did not object to Kudla's requested that the appellate court decision be vacated, reissued, and properly served on Kudla.  ECF Doc. 6-2 at 6.  Kudla replied. ECF Doc. 6-2 at 8-10.  On February 22, 2018, the Ohio Court of Appeals granted Kudla's motion, vacated its order; reissued the order and directed the clerk of courts to serve it upon Kudla.  ECF Doc. 6-2 at 19-20.

### D.      Motion for Reconsideration of Rule 26(B) Application

On March 6, 2018, Kudla moved for reconsideration of the denial of his application under Rule 26(B).  ECF Doc. 6-2 at 21-59.  He argued that:

> Defendant-Appellant's application for reopening pursuant to App.R. 26(B) was improperly denied on a purported procedural error (possibly due to either confusing or conflating the two different stages and steps of the procedure) and the court made no attempt to consider whether Defendant-Appellant had raised a colorable claim as to the ineffective assistance of appellate counsel when it is the appellate court's mandated in addressing a timely filed application for reopening to determine whether a "genuine issue" [as to the ineffectiveness of his appellate counsel] exists.

ECF Doc. 6-2 at 31.  The State opposed Kudla's motion, and Kudla replied.  ECF Doc. 6-2 at 67-77, 79-81.  On April 17, 2018, the Ohio Court of Appeals denied Kudla's motion, finding that it was filed beyond the ten-day deadline for moving for reconsideration, and that Kudla had not explained why his application was untimely under App.R. 26(A)(1)(a).  ECF Doc. 6-2 at 83-84.  On May 15, 2018, Kudla appealed the Ohio Court of Appeals' decision to the Ohio Supreme Court, asserting five propositions of law that challenged the Ohio Court of Appeals' interpretation and application of Rule 26(B)(2)(c).  ECF Doc. 6-2 at 88-89.  The State waived its memorandum of response.  ECF Doc. 6-2 at 113.  On July 5, 2018, the Ohio Supreme Court declined to accept jurisdiction.  ECF Doc. 6-2 at 114.

### E.  Petition for Writ of Mandamus

On November 20, 2018, Kudla petitioned for a writ of mandamus from the Supreme Court of Ohio.  ECF Doc. 6-2 at 115.  Kudla raised ten "complaints," unrelated to the issues now before us in Kudla's federal habeas petition.  *See* ECF Doc. 6-2 at 123-134.  The State moved to dismiss Kudla's petition and for judgment on the pleadings.  ECF Doc. 6-2 at 360, 388.  On February 13, 2019, the Ohio Supreme Court granted the State's motions.  ECF Doc. 6-2 at 367.

### F.  Revisiting Application to Reopen under Rule 26(B)

On December 27, 2019, Kudla moved the Ohio Court of Appeals to amend his reply brief, submitted in relation to his application to reopen, because, although the Ohio Court of Appeals vacated its January 27, 2017 order, entered a new order on February 22, 2018, and instructed the clerk to serve the order, the clerk had never done so.  ECF Doc. 6-2 at 411-413.  The State opposed Kudla's motion.  ECF Doc. 6-2 at 459-462.  And Kudla replied.  ECF Doc. 6-2 at 464-471.

On February 4, 2020, a magistrate judge granted Kudla's motion in part, finding that the clerk of courts never reissued the court's order and ordering the clerk to do so.  ECF Doc. 6-2 at 472-473.  In all other respects, Kudla's motion was denied.  *Id.*

On February 24, 2020, Kudla moved the Ohio Court of Appeals to issue a new order compelling the clerk of courts to properly reissue order.  ECF Doc. 6-2 at 474-477.  On March 26, 2020, the Ohio Court of Appeals denied Kudla's motion, declining to instruct the clerk of court to reissue the order for a third time.  ECF Doc. 6-2 at 486.  However, the Ohio Court of Appeals did find it necessary to reenter the order it previously issued and ordered the clerk's office to serve the order.  ECF Doc. 6-2 at 486-487.

### G.     Second Motion for Reconsideration of Application to Reopen

On April 16, 2020, Kudla moved for reconsideration of the Ohio Court of Appeals' order denying his application for reopening.  ECF Doc. 6-2 at 488-527.  The State opposed Kudla's motion, and Kudla replied.  ECF Doc. 6-2 at 529-538.  On June 5, 2020, the Ohio Court of Appeals denied Kudla's motion, finding that Kudla failed to show that the court committed an obvious error in denying his application for reopening.  ECF Doc. 6-2 at 539-540.

On June 7, 2020, Kudla appealed to the Ohio Supreme Court.  ECF Doc. 6-2 at 541-559.  The State opposed Kudla's appeal.  ECF Doc. 6-2 at 565-577.  On September 15, 2020, the Ohio Supreme Court declined to accept jurisdiction over Kudla's appeal.  ECF Doc. 6-2 at 579.

## II.     Current Habeas Petition

On February 11, 2021, Kudla filed his habeas petition, raising four claims for relief:

**GROUND ONE:** Ineffective Assistance of Appellate Counsel (IAAC).

**Supporting facts:** Appellant was denied effective assistance of appellate counsel when appellate counsel failed to thoroughly investigate the factual and legal elements of the problem when winnowing the issues on appeal in which significantly stronger issues were dismissed, ignored, or ineffectively argued and patently weaker issues erroneously advanced in violation of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.  []

**GROUND TWO:** (Under IAAC) The trial court erred on two different occasions when it allowed, over objection, impermissible expert testimony which, directly or indirectly, improperly bolsters the credibility of the alleged victim to the prejudice of the defendant in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

**Supporting facts:** Appellate counsel was ineffective for failing to raise the issues and errors in regards to impermissible expert testimony (a.k.a. Boston violations), that were objected to at trial no less, specifically pertaining to the error of Colleen Shrout impermissibly testifying as to the veracity of the alleged victim; and Cynthia Keck-McNulty presenting expert opinion testimony without an appropriate "reliable" foundation that was tantamount to testifying to the veracity of the alleged victim; both of which are not only highly improper – but egregious, prejudicial, and constitutes reversible error.  Appellant included incontrovertible evidence that appellate counsel prematurely dismissed these errors; that if

16

properly presented the result of the appeal would have been different; and it was absolutely inexcusable that they were not included in the appeal, especially considering that Appellant provided to appellate counsel multiple cases that mirrored Appellant's (in which the alleged victims also testified) that were reversed and remanded on this very issue (e.g., application to reopen, Exhibits D-G).

**GROUND THREE:** (Under IAAC) The trial court erred to the prejudice of the defendant when it permitted the State to introduce testimony pertaining to additional discovery [disclosed] via email beyond the 21-day requirement of Crim.R.16(k) and Evid.R.403(A) in violation of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

**Supporting facts:** The introduction of inadmissible evidence by the prosecutor was in violation of Crim.R.16(K) and Evid.R.403(A).  The untimely notice of the additional discovery precluded appellant from defending against the prosecutor's theory; leaving him unable to procure witnesses; or obtain documentation which reflects that the SID test ordered March 16, 2014, was cancelled and refunded on March 17, 2014; Additionally, and more importantly, this inadmissible evidence was used to help nullify and negate crucial exculpatory SID evidence that should have otherwise proved that Appellant was falsely accused and innocent; which constitutes part of the claim of egregious prosecutorial misconduct for eliciting false testimony and presentation of a false witness.

**GROUND FOUR:** (Under IAAC) The defendant was denied effective assistance of counsel and a fair trial when the video interview of the alleged victim with police was introduced without an expert to provide the jury with relevant information to make an educated determination of evidence "sufficiently beyond common experience," in violation of the Fifth, Sixth, and Fourteenth Amendments [to the] U.S. Constitution.

**Supporting facts:** Although it could possibly be argued that the decision to play part of the recording may be considered "trial strategy," what appellate counsel failed to address is why this supposed strategy was critically flawed, deficient, and prejudicial.  Complex matters such as special interviewing protocols and procedures necessary to collect crucial "reliable" evidence from suspected victims of sexual abuse require more treatment than matters of lesser complexity and consequence.  Trial counsel's decision to play the video interview with police without an expert witness to provide the jury with relevant information so that they could make an educated determination of evidence "sufficiently beyond common experience" is not trial strategy, but ineffective assistance of trial counsel (IAAC).  IATC that adversely affected the outcome of the trial and denied the defendant the right to receive a fair trial.  (The quality of forensic interviewing practices is of the utmost importance if child victims are to be protected, and at the same time the rights of innocent suspects are to be upheld – which didn't happen in this case).

ECF Doc. 1 at 5-10.

### III.    Law and Analysis

####    A.    Procedural Default

#####       1.    Applicable Standards

In essence, a petitioner seeking a writ of habeas corpus in federal court must have first received a ruling on the merits of his federal constitutional claim in state court.  And in seeking state court review, the petitioner must have given the state courts a "*fair*" opportunity to act on his claims.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original).  If the petitioner hasn't done so, and has no legal mechanism by which to do so now, the claim he failed to present is procedurally defaulted; and such defaults usually preclude us from acting on the claim.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Williams v. Anderson*, 460 F.3d 789, 809 (6th Cir. 2006).  For a claim to have been fairly presented, the factual and legal basis of the claim asserted by the petitioner must have raised at each and every stage of state review.  *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

The procedural default doctrine also precludes federal review if the petitioner has failed to follow the state's procedural requirements for presenting his claim in state court.  *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  This doctrine flows from the insight that courts must have the authority to insist that "defendants present their arguments on time and according to established procedures."  *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019).  Thus, we will not consider a habeas petition if "the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is 'independent of the federal question and

is adequate to support the judgement.'" *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quotation marks omitted).

Courts in this Circuit apply a four-part test to decide whether a petitioner has procedurally defaulted his claim by failing to comply with state procedural rules. A petitioner procedurally defaults a claim if: (i) the petitioner fails to comply with a state procedural rule; (ii) the state courts enforced the rule; (iii) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (iv) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Because the procedural-default bar to federal habeas review is severe, courts have created safety-valves. A petitioner can obtain review of procedurally defaulted claims if he shows: (1) "cause," *i.e.* that some external factor over which he had no control kept him from complying with the state rule or fairly presenting his claim; and (2) "prejudice," *i.e.* that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability that a different outcome would have resulted if the alleged constitutional violation hadn't occurred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012). A petitioner can also obtain review of a procedurally defaulted claim if it is based on new evidence that he was factually innocent of the crime of conviction. *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."); *Bousley v. United States*, 523 U.S. 614, 623 (1998) ("[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency."); *Schlup v. Delo*, 513 U.S. 298, 324 (1995)

(An actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial.").

      **2.**      **Arguments**

In his petition, Kudla preemptively addresses the issue of procedural default, arguing that he properly raised at least four assignments of error within his application to reopen his direct appeal under Rule 26(B).  *See* ECF Doc. 1 at 4-5; ECF Doc. 1-14 at 21-22.  He argues that he properly presented claims for ineffective assistance of appellate counsel based on: (i) the admission of testimony in violation of Ohio Evid. R. 608; (ii) the admission of evidence in violation of Ohio Crim. R. 16(K) and Evid. R. 403(A); (iii) ineffective assistance of trial counsel for failing to present expert testimony in conjunction with playing the videotaped interview of B.M.K. by the police; and (iv) the manifest weight of the evidence (referencing allegations that the prosecutor improperly invoked "god" and made misstatements of the facts and evidence during the rebuttal argument).  ECF Doc. 1-14 at 22.  Kudla argues that he properly presented these four claims because applications under Rule 26(B) are the "first stage" of post-conviction review, requiring only that the issues be raised and not fully briefed.  *See* ECF Doc. 1-14 at 30-44.  Alternatively, he argues that Rule 26(B)(2)(c) is unconstitutionally vague because it fails to provide fair notice of the requirements for complying with the rule; and "invites arbitrary and discriminatory enforcement," which renders the rule not firmly established or regularly followed.  ECF Doc. 1-14 at 44-55.  Kudla also argues that a fundamental miscarriage of justice would occur if his claims were dismissed as being defaulted because the failure of his counsel to properly investigate his claims and identify inconsistencies in the trial evidence, in conjunction with evidence of prosecutorial misconduct, undermines the evidence supporting his convictions and shows his actual innocence.  ECF Doc. 1-14 at 55-84.

The Warden contends that all of Kudla's grounds for relief are procedurally defaulted. *See* ECF Doc. 6 at 12-27. He argues that, to the extent Kudla seeks to assert the substantive claims on which his ineffective assistance of counsel claims are based, his Rule 26(B) application did not preserve the claims. ECF Doc. 6 at 12-15. Further, the Warden acknowledges that Kudla attempted to raise these claims in his application to reopen his appeal under Ohio App.R. 26(B), but argues that because Kudla did not comply with Rule 26's procedural requirements, his claims are defaulted based on a state procedural rule. *See* ECF Doc. 6 at 15-22. The Warden contends that Kudla cannot overcome the default because he has not shown cause for his default or any resulting prejudice. ECF Doc. 6 at 22-23. Additionally, he argues that there is no miscarriage of justice based on the canceled STD test because Kudla acknowledges that it could, at best, only create reasonable doubt and cannot show his actual factual innocence. ECF Doc. 6 at 24-28. In his traverse, Kudla reiterates his arguments. ECF Doc. 8 at 5-27.

### 3. Analysis

As an initial matter, Kudla raises his contention that Rule 26(B)(2)(c) is unconstitutionally vague for the first time in his petition and, thus, that claim was never fairly presented before the Ohio courts, precluding our ability to rule on it. *See Wagner*, 581 F.3d at 418. Moreover, the Warden is correct that, to the extent Kudla is attempting to raise the substantive – or underlying – claims on which his ineffective assistance of appellate counsel grounds are based, his application to reopen did not preserve those substantive grounds for federal habeas review. *See Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208, 218 (6th Cir. 2019); *Wogenstahl v. Mitchell*, 668 F.3d 307, 343 (6th Cir. 2012) ("[e]xhaustion of this [trial

counsel ineffective-assistance] claim does not similarly exhaust the underlying substantive claim. . . .").

As to Kudla's claims, it is a close question whether the state court's enforcement of Rule 26(B)(2)(c) on Kudla's application can be considered to have been sufficiently routine that it did not constitute unfair surprise, but – due to the deference given to the state court's interpretation of its own procedural rules – ultimately, I recommend that the court dismiss Kudla's claims as procedurally defaulted.

There can be no doubt that the Ohio Court of Appeals declined to reopen Kudla's direct appeal, because it concluded that Kudla's application did not comply with the requirements of Rule 26(B).  Specifically, the court found that Kudla did not assert specific assignments of error within the ten-pages of his application, as required by Ohio App. R. 26(B)(2)(c).  ECF Doc. 6-1 at 587.  Ohio Appellate Rule 26(B)(2)(c) states:

> (2) An application for reopening shall contain all of the following:
>
> [* * *]
>
> (c) One or more assignments of error or arguments in support of assignments of error that previously were not considered on the merits in the case by any appellate court or that were considered on an incomplete record because of appellate counsel's deficient representation.

Ohio App. R. 26(B)(2)(c).

Reviewing these circumstances under the *Maupin* factors, it is clear that the Ohio Court of Appeals concluded Kudla had not met the requirements of the Rule 26(B) and enforced the requirement of Ohio App. R. 26(B)(2)(c) by declining to reopen his direct appeal.  *See Maupin*, 785 F.2d at 138.  Analysis of the first and third factors, however, is linked.  Whether Kudla failed to comply with Ohio App. R. 26(B)(2)(c) depends on the Ohio Court of Appeals' discretionary interpretation of Kudla's application which, in turn, influences our understanding

of whether the rule is an adequate and independent basis for denying review.  As such, I will first

consider whether Rule 26(B)(2)(c) is an "adequate and independent" basis for default.

Neither the Sixth Circuit nor any sister district court within the Circuit has decided

whether Rule 26(B)(2)(c) is an adequate and independent basis for finding a procedural default.

However, the issue of independence is readily decided.  The Ohio Court of Appeals' analysis of

Kudla's compliance with Rule 26(B)(2)(c) was not in any way tied to federal law or Kudla's

federal constitutional claims.  *See Lovins*, 712 F.3d at 295; ECF Doc. 6-1 at 587.  Thus, the

enforcement of the Rule was "independent."

As to adequacy, the Sixth Circuit has explained that a state procedural rule "is adequate if

it was firmly established and regularly followed by the time it was applied."  *Stone v. Moore*, 644

F.3d 342, 347 (6th Cir. 2011) (quoting *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002)).

The Ohio Court of Appeals has relied on Rule 26(B)(2)(c) as a ground for rejecting Rule 26(B)

applications to reopen as far back as 1998.  *See State v. Gauntt*, No. 63792, 1998 Ohio App.

LEXIS 1062, at *14 (Ct. App.); *see also Walker v. Martin*, 562 U.S. 307, 318 (2011) (noting that

the state procedural rule at issue was regularly followed because "[e]ach year, the California

Supreme Court summarily denies hundreds of habeas petitions" based on the two disputed state-

court precedents).  Our review has identified at least 23 cases decided since 1998 in which

applications to reopen under Rule 26(B) were denied specifically due to the insufficiency of the

assignments of error alleged.[2]  Moreover, in the Ohio Court of Appeals' discussions of the

---

[2] *See State v. Wachee*, 2021-Ohio-4427 (Ct. App); *State v. Knox*, 2019-Ohio-3567 (Ct. App); *State v. Cobb*, 2019-Ohio-2320 (Ct. App); *State v. Callahan*, 2019-Ohio-941 (Ct. App); *State v. Romeo*, 2018-Ohio-2482 (Ct. App); *City of Cleveland v. Zingale*, 2018-Ohio-1189 (Ct. App); *State v. Gurkovich*, 2017-Ohio-7061 (Ct. App); *State v. Melton*, 2017-Ohio-2648 (Ct. App); *State v. Jackson*, 2016-Ohio-7474 (Ct. App); *State v. Hudson*, 2016-Ohio-4795 (Ct. App); *State v. Saur*, 2013-Ohio-1674 (Ct. App); *State v. Bonneau*, 2013-Ohio-696 (Ct. App); *State v. Saunders*, 2012-Ohio-4586 (Ct. App); *State v. Bartoe*, 2012-Ohio-154 (Ct. App); *State v. Fryerson*, 2010-Ohio-1852 (Ct. App); *State v. Jackson*, 2007-Ohio-5431 (Ct. App); *State v. Gibson*, 2004-Ohio-2150 (Ct. App); *State v. Fanning*, 2002-Ohio-4888 (Ct. App); *State v.

insufficiency of assignments of error, the courts have routinely recognized that insufficiency is an independent basis for denying applications to reopen under Rule 26(B).  *See e.g.*, *State v. Knox*, 2019-Ohio-3567, at ¶ 6 (Ct. App.) ("Knox's application fails to set forth any proposed assignments of error.  This is sufficient grounds to deny the application.  However, this court will address the arguments that can be gleaned from the application to the extent that they can be discerned." (Internal citation omitted)); *City of Cleveland v. Zingale*, 2018-Ohio-1189, at ¶ 4 (Ct. App.) ("Zingale's application for reopening contains no such assignment of error or argument [as required by App.R. 26(B)(2)(c)].  Without providing an assignment of error [. . .] it is not possible to evaluated an App.R. 26(B) application to reopen."); *State v. Melton*, 2017-Ohio-2648, at ¶ 5 (Ct. App.) ("Melton's application for reopening is fatally flawed on two separate grounds: (1) failure to state an assignment of error as required under App.R. 26(B)(2)(c) [. . . .]  Either ground is a sufficient basis to deny the application for reopening.").

However, in some instances, the Ohio Courts of Appeals, although noting the appellant's insufficient assignments of error, have nevertheless, ruled on the merits of the alleged errors, to the extent possible.  *See e.g.*, *State v. Cobb*, 2019-Ohio-2320, at ¶ 7 (Ct. App.) (finding that "[w]hile the failure to include proposed assignments of error in an application is grounds for denial, Cobb's application should not be dismissed based on this where sufficient argument is made to discern the proposed issue."); *State v. Saunders*, 2012-Ohio-4586, at ¶¶ 4-8 (Ct. App.) (noting that the lack of assignments of errors under App.R. 26(B)(2)(c) but reviewing the applications merits, to the extent they could be construed, in denying the application); *State v. Fryerson*, 2010-Ohio-1852, at ¶¶ 6-11 (Ct. App.) (same).

---

*Phillips*, No. 79192, 2002 Ohio App. LEXIS 1153, at *1-2 (Ct. App.); *State v. Graff*, No. 74860, Motion No. 20937, 2001 Ohio App. LEXIS 2220, at *5-6 (Ct. App.); *State v. Vrabel*, 2000-Ohio-2650 (Ct. App.); *State v. Kelly*, Nos. 74912, 12367, 2000 Ohio App. LEXIS 2907, at *8-9 (Ct. App.); *State v. Cripple*, No. 61773, Motion No. 97933, 1998 Ohio App. LEXIS 5451, at *9 (Ct. App.).

Kudla contends that the courts' enforcement of Rule 26(B)(2)(c) in such cases is distinguishable from its enforcement of the rule in connection with his application because in those cases, the applications lacked *any* statements that could be reasonably construed as assignments of error, or the allegations were so insufficient that the state appellate courts were *unable to identify* the alleged errors.  *See* ECF Doc. 8 at 7-16.  In contrast, Kudla asserts that his application clearly identified the specific instances of ineffective assistance he wished to challenge and explained his reasoning.  *Id.*

Part of why determining the procedural default issue in this case is so challenging is because Kudla's contentions are facially reasonable.  In an underlined heading Kudla stated: "Appellate counsel failed to perform full and adequate due diligence in preparing the previously submitted appeal brief."  ECF Doc. 6-1 at 186.  Under this heading, Kudla argued that his appellate counsel focused on poor arguments to the exclusions of more meritorious ones, and failed to argue that "trial counsel was ineffective for failing to object to hearsay testimony from Dr. Keck-McNulty and for trial counsel playing the recording of B.M.K.'s interview with Police."  ECF Doc. 6-1 at 186-187.  He also explained that in an attached exhibit he:

> [A]ddresses how the introduction of new evidence made available well within the 21-day rule for discover[y] in violation of Criminal Rule 16(k) and Evid.R.403(A) should have been inadmissible because it did not allow adequate time to properly and thoroughly investigate. . . . Appellant submits [the exhibit], as proof of ineffective assistance of appellant counsel because they failed to raise the error when this evidence vary clearly should have been inadmissible, prejudiced Mr. Kudla at trial, and shows exactly why Criminal Rule 16(k) exists and needs to be adhered to.

ECF Doc. 6-1 at 189-190.  And, Kudla asserted that:

> Although the decision to play part of the recording of B.M.K.'s interview with police may have been part of counsel's "trial strategy," what appellate counsel failed to address is why this strategy was critically flawed and therefore prejudicial.  Appellant argues that trial counsel should have either (1) presented an expert witness to give the jury relevant information so that they could make an

education determination of evidence "sufficiently beyond common experience", and exactly why what the police did in this situation was dead wrong and goes against everything known today about proper interviewing methods and procedures []; or (2) not introduce the recording at all because without an expert witness to assist the jury in properly evaluating this evidence it would be counterproductive and prejudicial.

ECF Doc. 6-1 at 190.

Based on his inclusion of these statements, it is understandable why Kudla would think his Rule 26(B) application was distinguishable from those submitted in cases in which the Ohio Court of Appeals enforced Rule 26(B)(2)(c). And although "[a] discretionary rule ought not to be disregarded automatically upon a showing of seeming inconsistencies," as the Supreme Court noted, "[a] state ground, no doubt, may be found inadequate when discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law." *Walker*, 562 U.S. at 320 (internal quotation marks omitted). However, alleged inconsistency in the enforcement of a discretionary rule, alone, is insufficient to find a rule inadequate to support a procedural default. *See id.* ("A discretionary rule ought not to be disregarded automatically upon a showing of seeming inconsistencies."). A rule is inadequate if its application is exercised in a "novel," "unforeseeable," or "infrequently, unexpectedly, or freakishly." *Id.* (internal quotation marks omitted).

The Ohio Court of Appeals has enforced Rule 26(B)(2)(c) and declined to reopen appeals when the Rule 26(B) applications had no assignments of error *and also* when the assignments of error were partially argued and required the court to construe the applicant's assertions. And, although Kudla made general allegations as to his appellate counsel's deficient performance, the assertions in his actual application were unmoored from the facts of his case, rendering it impossible for the Ohio Court of Appeals to deduce from the application the specific assignments of error Kudla claims his appellate counsel should have raised on direct appeal. In

26

light of these ambiguities and the Ohio Court of Appeals' application of the rule in both

scenarios, I do not find that the rule's enforcement in this case was either "unforeseeable" or

"freakish."  Consequently, I find that Rule 26(B)(2)(c) was both independent and adequate and,

as a result, Kudla's application did not comply with its procedural requirements.  *See Maupin*,

785 F.2d at 138.

More generally, however, Kudla's reading of why the Ohio Court of Appeals rejected his

Rule 26(B) application is too narrow.  He contends the application was denied because he did not

assert specific assignments of error in his application.  As described above, the Ohio Court of

Appeals did indeed make that finding.  *See* ECF Doc. 6-1 at 587.  But it also faulted Kudla for

his violation of the mandatory ten-page limitation found in App.R. 26(B)(3).[3]  After citing the

ten-page limitation ("applications for reopening 'shall not exceed ten pages, exclusive of

affidavits and parts of the record"), the court stated: "An application to reopen is properly denied

where the applicant does not comply with the mandatory provision of App.R. 26(B)."  ECF

Doc. 6-1 at 586.  The court pointed out that:

> Appellant's application consists of numerous arguments that his appellate counsel
> was ineffective because he did not raise many winning issues on appeal, all of
> which Appellant suggested correspondence.  Appellant attached to his application a
> sizeable amount of exhibits, many of which are multiple, single spaced pages of
> text that he characterizes as assignments of error that he proposed to his former
> counsel while his appeal was pending.  Within the ten pages of his actual
> application, however, he fails to assert any specific assignment(s) of error that were
> previously not considered or that were considered on an incomplete record.  *See*
> App.R. 26(B)(2)(c), (3).  Because Appellant's application does not comply with
> App.R. 26(B), it is denied.

ECF Doc. 6-1 at 587.  It cannot be disputed that the Ohio Court of Appeals denied Kudla's

application for violating two separate subsections of Rule 26(B), subsections (B)(2)(c) and (3).

Either one would have been an adequate basis for finding procedural default in this matter.

---

[3] This rule has subsequently been renumbered App.R.26(B)(4).

Notably, the state's response in opposition to Kudla's Rule 26(B) application relied entirely on Kudla's violation of the mandatory ten-page limit set forth in Ohio App. R. 26(B)(4).

### 4.     Excuses for Procedural Default (*Maupin*'s Fourth Factor)

Kudla has not argued that there was any cause over which he had no control that might excuse his procedural default of these claims.  He does, in essence, argue that he misunderstood the specific requirements of Rule 26(B) and that he thought the application was not the place to fully explain the merits of his claims of ineffective assistance of appellate counsel.  *See generally* ECF Doc. 1; ECF Doc. 1-14.  But Kudla's ignorance of what Rule 26(B) requires cannot serve as cause to excuse his default, because it was not "external to the defense" or something over which he had no control.  *See Coleman*, 501 U.S. at 750; ECF Doc. 1-14 at 44-49.  And it is well settled that a habeas petitioner's ignorance of the law cannot excuse his procedural default.  *See Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) (citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995)).  Kudla's failure to show cause to excuse his procedural default means we need not consider whether he can show prejudice.  *See Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007) ("A petitioner must satisfy both prongs to overcome procedural default.").

Lacking any colorable showing of cause to excuse his default, Kudla's only recourse to overcome his procedural default is to argue that a miscarriage of justice would result if the court denied his petition.  *See Coleman*, 501 U.S. at 750.  At its core, Kudla's argument in support of a miscarriage of justice is that a canceled order for an STD test "offers reasonable doubt to the jury that Appellant never diagnosed and treated himself of the chlamydia that the prosecutor conveyed to the jury he passed to the alleged victim," which was further exacerbated by his appellate counsel's failure to investigate and present evidence of prosecutorial misconduct in engaging with the victim.  *See* ECF Doc. 1-14 at 55-80.

However, arguing that some piece of evidence might have created reasonable doubt does not satisfy the standard for proving actual factual innocence.  *See Bousley*, 523 U.S. at 623 ("actual[] innocen[ce]" means "factual innocence, not mere legal insufficiency.").  Although Kudla argues that this combination also undermines the factual grounds against him, the canceling of a STD test cannot stand for more than just that – a cancelled STD test.  That fact alone does not prove that Kudla *never* had chlamydia, and, thus, the combination of circumstances is not dispositive of his actual, factual innocence.  *See e.g.*, *Cleveland v. Bradshaw*, 693 F.3d 626 (6th Cir. 2012) (finding that a petitioner presented a valid actual innocence claim based on the solely eye witness's recanted testimony, a forensic scientist's reevaluation of the time of the victim's death, a witness's statement that he met with the prisoner, and flight records); *Larsen v. Soto*, 730 F.3d 930 (9th Cir. 2013) (finding that a petitioner's evidence that he had not held a gun was sufficient that no reasonable jury would have found him guilty of possession of a deadly weapon beyond a reasonable doubt).

Moreover, the fact that Kudla canceled an order for an STD test is not "new" evidence as that term has been defined by the Supreme Court.  *See Schlup*, 513 U.S. at 324 (An actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial.").  Kudla was aware long before the trial that he had placed but canceled an order for an STD test.  He cannot succeed on a manifest injustice, actual innocence claim as a basis to overcome his procedural default by relying on evidence that is not "new."

## B. Procedural Default Recommendation

Because Kudla procedurally defaulted each of his four claims, has no cause to excuse the default, and has not raised a viable claim of actual innocence, I recommend that Kudla's claims be dismissed as procedurally defaulted and his petition be denied.

29

In making this recommendation, I cannot fail to acknowledge that Kudla vehemently disagrees with the decision of the Ohio Court of Appeals to reject his application to reopen under Ohio App. R. 26(B).  He does so because he feels he complied with App.R. 26(B).  Examination of Kudla's 397-page Rule 26(B) application and exhibit/appendix package does reveal the proposed direct appeal assignments of error Kudla *asked* his appellate counsel to assert while the direct appeal was still pending.  *See* ECF Doc. 6-1 at 289 (Exhibit H to the Rule 26(B) application).  But the Ohio Court of Appeals could not use those to identify Kudla's specific ineffective assistance of appellate counsel claims.  Why?  Because Kudla directly stated that, "nowhere in Exhibit H, P, S, or T does Appellant ever argue ineffective assistance of appellate counsel."  ECF Doc. 6-1 at 581.  Indeed, Kudla's reply brief reasserted that "appellate counsel was deficient in adequately representing him because they failed to perform full and adequate due diligence with their 'inquiry and analysis of the factual and legal elements of the problem in preparing . . . the appellate brief . . . and in adequately exploring other stronger assignments of error that were evident from the record."  *Id.*  And he argued that his application *did* contain the assignments of error without regard to the 387 pages of material beyond the application itself.  However, a review of the application belies that assertion.  First, Kudla made repeated references in the application to the attached exhibits and to his attached "Investigative Report."  Second, he *did not* recite the proposed assignments of error he claimed his appellate counsel was ineffective for failing to assert.  As it turns out, his effort to persuade the Ohio Court of Appeals in this way failed.  And his efforts to persuade the Ohio Supreme Court and the Ohio Court of Appeals (on reconsideration) to come to a different conclusion also failed.

The bottom line for our analysis?  Kudla never obtained merits review of his ineffective assistance of appellate counsel claims – the same claims he now asserts in his habeas petition –

in the courts of Ohio.  Those claims have all been procedurally defaulted and should be
dismissed.

## IV.  Merits

Although the Court should dismiss Kudla's claims on the basis of procedural default, in
order to be of greatest service to the Court in the event my procedural default analysis is not
accepted, I will analyze below the merits of Kudla's Ground One, Two, and Four claims.

### A.    Ground Three Asserts a Noncognizable Claim

Although Kudla's Ground Three claim is likewise procedurally defaulted, a review of the
claim's merits is, ultimately, unnecessary.  Kudla's Rule 26(B) application asserted an error with
the trial court's and court of appeals' handling of the State's allegedly non-compliant production
of evidence under Ohio Criminal Rule 16 and Ohio Evidence Rule 403[4].  *See* ECF Doc. 1-14
at 95.  Kudla's Ground Three claim challenges the trial court's rulings (or alleged failures to
rule) based solely on errors in state law; and those arguments are non-cognizable on habeas
review, unless Kudla could show that he was sufficiently prejudiced by the rulings to raise a due
process violation.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of
a federal habeas court to reexamine state-court determination on state-law questions.").

Kudla's contentions do not rise to the level of a due process violation.  As background,
Kudla's arguments stem from the forensic investigation of electronics taken from his home.  *See*
ECF Doc. 6-3 at 1071-1079.  Kudla's trial counsel objected to a portion of the forensic
investigator's testimony before the trial court, arguing that a "supplemental report" had not been
provided more than 21 days in advance of the trial, and its late disclosure impaired his ability to

---

[4] Kudla's petition and brief in support do not indicate whether Kudla's argument is under the Federal or
Ohio Rules of Evidence.  However, in an exhibit explaining the arguments he intended to present if his
application to reopen were successful, Kudla specifies that he is referencing Ohio Rule of Evidence 403.
*See* ECF Doc. 6-1 at 308.  Accordingly, I will treat Kudla's petition as referencing the Ohio rule.

respond to the evidence.  *See* ECF Doc. 6-3 at 1074-1075.  The State responded that the report

and supplemental reports had been provided within the 21 days, but the information Kudla's

counsel was challenging stemmed from a follow-up email the witness had sent; that email was

sent as soon as possible to Kudla's counsel upon its receipt.  *See* ECF Doc. 6-3 at 1075-1078.

The trial court permitted the evidence, but ordered the State to give Kudla access to his phone in

order to find any contacts necessary to rebut the testimony.  ECF Doc. 6-3 at 1077-1078.

Subsequently, defense counsel indicated that, in consultation with Kudla, they determined that

review of the phone was not necessary.  *See* ECF Doc. 6-3 at 1112-1113.

Based on these facts, Kudla's contention that the alleged violation of Crim. R. 16 and

Evid. R. 403 was a due process violation fails.  As to Ohio Evid. R. 403, Kudla contends that the

evidence was misleading because it was admitted and confirmed by allegedly concocted

testimony, but he did not assert that the evidence itself was irrelevant to the allegations against

him and, thus, it would not be prohibited under Rule 403.  *See* Ohio Evid. R. 403.  As to Crim.

R. 16, it is unclear whether Kudla's counsel challenge was intended to be to the supplemental

report or the subsequent email.  To the extent he intended to challenge the report, the report was

properly disclosed under Rule 16 and the additional information was provided as soon as

possible.  *See* ECF Doc. 6-3 at 1075-1078.  To the extent he challenged the subsequent email, the

prosecution stated that it provided the witness's responses as soon as possible.  And the trial

court's corrective action for the late disclosure – providing Kudla access to the contacts in his

phone – was reasonable, given the court's discretion to determine the appropriate sanction and

the state's lack of ill intention and promptness in providing the information.  *See* Ohio Crim.

R. 16(E)(3); *State v. Parson*, 6 Ohio St. 3d 442, 445 (1983).  Even had the sanction been

unreasonable, Kudla would not be able to demonstrate any prejudice because his counsel later indicated that no review of the phone was necessary.  *See* ECF Doc. 6-3 at 1112-1113.

Thus, although I recommend that the court find Kudla's Ground Three claim procedurally defaulted, should that recommendation be rejected, I recommend that the claim be denied for being non-cognizable, because the claim merely challenges the state court's ruling on an issue of state court procedure and rules; and Kudla has not shown that the delayed disclosure rendered his trial fundamentally unfair.

### B.  Legal Standards for Merits Review

#### 1.  AEDPA Deference

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") permits a federal court to grant relief only if that decision: (i) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (ii) was based on an unreasonable determination of the facts in light of the record before the state court.  28 U.S.C. § 2254(d).  "Unreasonable" doesn't simply mean that the state court got it wrong. *Chinn v. Warden, Chillicothe Corr. Inst.*, 24 F.4th 1096, 1101 (6th Cir. 2022).  Only if no "fairminded jurist" could agree with the state court may we grant relief.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

#### 2.  Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are tough to win.  The petitioner has to show that: (1) trial counsel behaved *unreasonably*; and (2) that unreasonable performance *prejudiced* the defense.  *Strickland*, 466 U.S. at 687.  And, if the claim was properly presented and decided on the merits in a state court, the petitioner also has to show that the state court's resolution of those issues was unreasonable.  *Harrington*, 562 U.S. at 88; *see also Taylor v. Patel*, No. 20-1381, ___

33

F. App'x ___, 2021 U.S. App. LEXIS 24142, at *12 (6th Cir. Aug. 11, 2021) (noting that the combination of both AEDPA and *Strickland* results in a "doubly" deferential standard). To act as counsel guaranteed by the Sixth Amendment, appellate counsel need only exercise reasonable professional judgment, and is not obligated to raise every "colorable" claim on appeal. *Jones*, 463 U.S. at 754. And counsel cannot be ineffective for failing to raise a meritless claim. *Shaneberger*, 615 F.3d at 452; *see also Smith v. Murray*, 477 U.S. 527, 536 (1986) (indicating that the task of winnowing out less persuasive arguments on appeal is the hallmark of an effective appellate advocate). Because both *Strickland* prongs must be satisfied for a petitioner to succeed on an ineffective assistance of counsel claim, if a petitioner fails to satisfy one prong, the other need not be considered. *Strickland*, 466 U.S. at 697.

To show that his appellate counsel performed deficiently, a petitioner "'must demonstrate that his appellate counsel made an objectively unreasonable decision by choosing to raise other issues instead of [the challenged issue].'" *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) (quoting *Webb v. Mitchell*, 586 F.3d 383, 399 (6th Cir. 2009)). To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for his counsel's unreasonable failure to raise this issue on appeal, he would have prevailed." *Id.* (internal quotation marks omitted). However, appellate counsel is not ineffective for failing to raise a claim if the underlying claim lacks merit. *Id.* (citing *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008)).

C.   **Analysis**

1.   **Ground Two**

Kudla contends that his appellate counsel was ineffective for failing to argue that the trial court erred in permitting Dr. Cynthia Keck-McNulty to provide expert opinion testimony on grooming because the opinions lacked the proper reliable principles and methods to support her

opinion under Ohio Rule 702(c); and in permitting Dr. Keck-McNulty and Colleen Shrout testify

as to the credibility of B.M.K.  ECF Doc. 1 at 7; ECF Doc. 1-14 at 93-100.

The Warden argues that Kudla's appellate counsel was not ineffective because the trial

court did not err in admitting the testimony of Shrout or Dr. Keck-McNulty.  ECF Doc. 6

at 30-46.  As to Dr. Keck-McNulty, the Warden contends that Dr. Keck-McNulty's testimony

satisfied Rule 702 because she testified to her extensive specialized knowledge, training, and

experience.  ECF Doc. 6 at 42-43.  Moreover, he argues that neither Shrout's nor Dr. Keck-

McNulty's testimony violated Rule 608 because the child victim testified, was subject to cross

examination, and, as to Dr. Keck-McNulty, was based on more than solely the victim's

statements.  See ECF Doc. 6 at 30-46.

In his traverse, Kudla reiterates his arguments, adding that to adopt the Warden's

interpretation of *Boston* would undermine the purposes of Ohio Evid. R. 608 and 702 and that

the evidence in support of the testimony's harmlessness is unreliable.  ECF Doc. 8 at 27-93.

### 2.    Law

Ohio Rule of Evidence 702 permits expert testimony if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Ohio Evid. R. 702.  Initially, I note that, "an inquiry whether evidence was properly admitted or improperly excluded under state law is no part of the federal court's habeas review of a state conviction [because] 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'"  *Rios v. Jenkins*, No. 3:14-CV-2462, 2017 U.S. Dist. LEXIS 138020, at *7 (N.D. Ohio Aug. 28, 2017).

Under Ohio law, "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant."  *State v. Boston*, 46 Ohio St. 3d 108, 129 (1989); *see also* Ohio Evid. R. 608.  But "[a]n expert can opine on whether he or she believes that a child has been sexually abused."  *Liddle v. Brunsman*, No. 5:09-CV-00587, 2010 U.S. Dist. LEXIS 122993, at *9 (N.D. Ohio Nov. 19, 2010).  The Ohio Supreme Court has explained:

> [The syllabus for *State v. Boston*, 46 Ohio St. 108 (1989)] excludes expert testimony offering an opinion as to the truth of a child's statements (e.g., the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person).  It does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity.

*State v. Stowers*, 81 Ohio St. 3d 260, 262-63 (Ohio 1998); *see also Liddle*, 2010 U.S. Dist. LEXIS 122993, at *9-10 ("The Ohio Supreme Court has been careful to differentiated between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility" (internal quotation marks omitted)).  Accordingly, "an expert can testify that a child's behavior is consistent with the behavior of other children who had been sexually abused so long as there is 'something other than the child's unsupported allegations that assisted the

excerpt in arriving at his or her opinion.'"  *Liddle*, 2010 U.S. Dist. LEXIS 122993, at *10 (quoting *State v. Schewirey*, 2006 Ohio 7054, at ¶ 48 (Ct. App.)).

Consistent with the court's deference we owe to state court interpretations of their own procedural rules, we "must presume that the Ohio state courts correctly interpreted Ohio evidence laws in their evidentiary rulings."  *Small v. Brigano,* 134 F. App'x. 931, 936 (6th Cir. 2005); *see also Marshall v. Lonberger,* 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules.").  Alleged errors in the evidentiary rulings, do not rise to the level of constitutional claims warranting habeas relief unless the errors amount to a due process violation under the Fourteenth Amendment.  *See Gott v. Coleman*, No. 3:15-CV-1148, 2016 U.S. Dist. LEXIS 144042, at *16 (N.D. Ohio July 21, 2016) (citing *Broom v. Mitchell*, 441 F.3d 392, 406 (6th Cir. 2006)).

3.      **Analysis**[5]

Should the Court prefer to address Kudla's Ground Two on the merits, I recommend that the claim be denied as meritless.  Although the propriety of Dr. Keck-McNulty's testimony was not reviewed by the Ohio Court of Appeals, Kudla's appellate counsel was not ineffective for failing to challenge the trial court's admission of Dr. Keck-McNulty's expert testimony under Rule 702, nor in permitting her to testify to her belief that B.M.K. was sexually abused under Rule 608 and *Boston*.  Further, Kudla's contentions against Shrout are also meritless under Rule 608.  *Strickland*, 466 U.S. at 687.

---

[5] Although the Ohio Court of Appeals reviewed Dr. Keck-McNulty's testimony in Kudla's direct appeal, its review was limited to her testimony regarding what B.R.K. told her during their sessions – not the generally admissibility of her testimony as a whole.  *See* ECF Doc. 6-1 at 50-53.

As to Rule 702, under *Strickland*'s first prong, Kudla's trial and appellate counsel did not act unreasonably because, ultimately, Kudla's counsel had no obligation to raise every colorable claim and cannot be called ineffective for failing to raise a meritless one. *See Jones*, 463 U.S. at 754; *Shaneberger*, 615 F.3d at 452. The heart of Kudla's contentions against Dr. Keck-McNulty, as it relates to Rule 702, is that her principles and methods for assessing B.M.K. were "grossly deficient," asserting that "Keck-McNulty's grooming behavior theory is not the type of scientific test that accurately and reliably determines whether sexual abuse has occurred." *See* ECF Doc. 1-14 at 96-98; ECF Doc. 8 at 79-93. But Kudla's contention fails. First, Rule 702(c) imposes additional requirements on the expert's support for her principles and methods "[t]o the extent that the testimony reports the rules of a procedure, test, or experiment." *See* Ohio Evid. R. 702(c). And Kudla challenges Dr. Keck-McNulty's understanding of the grooming *process*. Thus, only the first sentence of Rule 702(c) applied – "The witness' testimony is based on reliable scientific, technical, or other specialized information."

In this regard, Ohio courts utilize Rule 702's requirements as a gatekeeping function to ensure the relevancy and reliability of an expert's testimony. *See Valentine v. Conrad*, 110 Ohio St.3d 42, 44 (2006). The weight given to that expert testimony, however, is exclusively left to the jury to determine. *State v. Wolery*, 46 Ohio St. 2d 316, 321 (1976). Thus, the question as to Dr. Keck-McNulty's testimony becomes whether evidence of her qualifications was so lacking that appellate counsel acted unreasonably in failing to challenge the admission of her testimony about grooming on appeal.

At trial, Dr. Keck-McNulty testified to her years of experience and specialized knowledge that supported her qualification under Rule 702. Specifically, she testified that she worked as a trauma specialist at Akron Children's Hospital, had a master's degree in human

development and counseling, and a doctorate in the same.  ECF Doc. 6-1 at 1115, 1118.  She attended training, seminars, and workshops on trauma and loss, even teaching classes and training sessions on the material.  ECF Doc. 6-1 at 1118.  She also recounted her 20 years of prior work experience, which largely focused on helping children who were victims of abuse.  *See* ECF Doc. 6-1 at 1119-121.  As to her work at Akron Children's Hospital, she worked to assess and treat adolescent children exposed to trauma or loss, including sexual or physical abuse, parental drug use, or domestic violence.  ECF Doc. 6-1 at 1115-1116.  She testified that about 85 % of her work involved children that were victims of sexual abuse.  ECF Doc. 6-1 at 1117.  In light of this experience and specialized knowledge (which Kudla affirmatively states he is not challenging), Dr. Keck-McNulty testified about grooming and its process as it related to her field.  *See* ECF Doc. 6-3 at 1122-1136.

Through the lens of Rule 702, the trial court's admission of Dr. Keck-McNulty's testimony was not clearly erroneous and, thus, the appellate counsel cannot be faulted for failing to challenge the admission.  *See Strickland*, 466 U.S. at 687; *Small,* 134 F. App'x. at 936.  Dr. Keck-McNulty had specialized knowledge and experience assessing and treating child victims of sexual abuse, which would be beyond a lay person's understanding.  *See* Ohio Evid. R. 702.  It was based on this specialized knowledge and experience that Dr. Keck-McNulty testified about grooming.  And because this assessment did not relate to reports or the interpretation of data, Rule 702(c)'s subsections did not apply.  *See* Ohio Evid. R. 702(c).  Further, to the extent Kudla's challenge relates to Dr. Keck-McNulty's conclusions on whether grooming occurred, the challenge fails because "[q]uestions about the certainty of the scientific results are matters of weight for the jury."  *See State v. Lang*, 129 Ohio St. 3d 512, 524 (2011).

Accordingly, Kudla's appellate counsel did not act unreasonably in not raising a challenge under Rule 702(c) to Dr. Keck-McNulty's testimony.  *See Strickland*, 466 U.S. at 697.

Kudla's contention that his appellate counsel's conduct was ineffective for failing to challenge the trial court's admission of Dr. Keck-McNulty's and Shrout's testimony under Rule 608 and in light of *Boston* also fails.  *Strickland*, 466 U.S. at 687.  It was not unreasonable for Kudla's appellate counsel to not challenge Shrout and Dr. Keck-McNulty's statements (even assuming they addressed B.M.K.'s credibility) because state law precedent existed that held *Boston* did not apply to the circumstances of Kudla's case.  Several Ohio appellate courts have held that, even if the opinion provided violated *Boston*, any prejudice is rendered harmless when the child victim testifies and is subjected to cross examination.  *See e.g., State v. Scott,* 2010-Ohio-3057, at ¶¶ 16-20 (Ct. App.) (holding that any error under *Boston* was harmless because "we have found on numerous occasions that *Boston* does not apply when the child victim actually testifies and is subject to cross-examination."); *State v. Amankwah,* 2008-Ohio-2191, at ¶¶ 27-45 (Ct. App.) (same); *State v. Futo*, 2008-Ohio-3360, at ¶¶ 7-14 (Ct. App.) (same).  Here, B.M.K. was 18 years old at the time of her meetings with Shrout and Dr. Keck-McNulty and at the time of trial, where she was subject to cross examination.  *See* ECF Doc. 6-3 at 503, 511, 744, 866.  As such, it would not be unreasonable for Kudla's appellate counsel to consider any challenge to the testimony a weak, if not meritless, argument.  *See Shaneberger*, 615 F.3d at 452.

Kudla strenuously disagrees with this conclusion.  And he attempted to discuss and distinguish numerous Ohio court decisions in order to persuade his appellate counsel that *none* of the cases in which alleged *Boston* violations were found to be harmless error after the alleged victim testified were like his case.  But that analysis was predicated on the Kudla's erroneous

40

conclusion that Dr. Keck-McNulty's and Shrout's opinions were the only things in evidence other than the he-said, she-said credibility contest between Kudla and his daughter.  But that is not the case.  In addition to other tell-tale conduct by B.M.K., testimony from Kudla's other daughter and his former girlfriend, Laila Menas, also supported the contention that sexual activity was occurring between Kudla and B.M.K.  Undoubtedly, Kudla would try to explain that other evidence away too.  But there was ample other circumstantial evidence to support the state's theory of the case that would have justified appellate counsel's decision not to make a *Boston*-violation argument.

In light of Dr. Keck-McNulty's qualifications and contrary case law, there is no basis for finding that Kudla's appellate counsel acted unreasonably in not challenging the admission of Dr. Keck-McNulty's and Shrout's testimony.  *See Moore*, 708 F.3d at 776.  Accordingly, Kudla's Ground Two claim could be denied for lack of merit.

### 4.    Ground Four

In his Ground Four claim, Kudla contends that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective for introducing the video of B.M.K.'s interview with police without also introducing expert testimony on coercive police interrogation tactics on minors that could lead to false "confessions."  ECF Doc. 1 at 10; ECF Doc. 1-14 at 102-121.

The Warden contends that Kudla has not shown that his trial counsel's decision to play the video interview at trial was unreasonable.  ECF Doc. 6 at 51-59.  He argues that trial counsel played the video as part of its strategy to discredit B.M.K., and Kudla's disagreement with the strategy does not render it deficient.  ECF Doc. 6 at 55-56.  Moreover, he argues that Kudla cannot show that his proceedings were sufficiently prejudiced by his appellate counsel's failure

to challenge the strategy.  ECF Doc. 6 at 56-59.  In his traverse, Kudla largely reiterates his arguments.  ECF Doc. 8 at 98-106.

###### 1.  Ohio Court of Appeals' Discussion

Although Kudla did not present his Ground Four claim to the Ohio Court of Appeals, it did make factual findings relevant to Kudla's claim.  In his direct appeal, Kudla challenged his defense counsel's decision to play the recording of B.M.K.'s interview with police and the court made factual findings on whether the decision constituted ineffective assistance of trial counsel, making the following findings:

> [*P62]  Finally, Mr. Kudla argues that his attorneys were ineffective because they played the recording of B.M.K.'s interview with the police for the jury.  He argues that the statements on the recording amounted to hearsay, so, had his own counsel not played the recording, the State would not have been able to do so.  He argues that there was no tactical purpose behind the decision to play the recording and that it "served only to support the veracity of [B.M.K.'s] trial testimony."

> [*P63]  Defense counsel's strategy at trial was to discredit B.M.K. by suggesting that she lied about a sexual relationship with her father in order to protect B.R.K.  Defense counsel argued that B.R.K. fabricated the accusations in order to save herself from further punishment and, forced to choose between her father and her emotionally distraught sister, B.M.K. decided to adopt the lie.  The attorney who delivered the closing argument for Mr. Kudla argued that the recording of B.M.K.'s police interview was evidence that the police gave her a "blueprint for fabrication" by explaining the grooming process to her in an attempt to draw her into disclosing the abuse.  He also argued that the recording showed that B.M.K. was lying, as she repeatedly denied the abuse and then slowly claimed that it happened, but was unable to recall many of the details surrounding the abuse.  Defense counsel argued that B.M.K. would not have forgotten details if she was an abuse victim because, for sexual abuse victims, those details "would be burned in your mind for the rest of your life."

> [*P64]  "Counsel's strategic or tactical decisions will not form the basis of an ineffective assistance of counsel claim."  *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 42.  Here, Mr. Kudla's defense attorneys played the police interview recording as part of their strategy to discredit B.M.K.  Indeed, Mr. Kudla has relied on the same recording on appeal as evidence that B.M.K. only admitted to a sexual relationship with her father "after the intensity of an extensive interrogation[.]"  Because Mr. Kudla's attorneys introduced the recording as part of their trial strategy, we cannot conclude that their decision to

do so amounted to ineffective assistance of counsel.  *See State v. Gary*, 9th Dist. Wayne No. 12CA0014, 2012-Ohio-5813, ¶ 38-39.  As such, Mr. Kudla's second assignment of error is overruled.

*Kudla*, 2016-Ohio-5215, at ¶¶ 62-64.

### 2.    Analysis

Should the court prefer to decide Kudla's procedurally defaulted Ground Four claim on the merits, it should be denied for lack of merit.  Kudla contends that the Ohio Court of Appeals' analysis on his defense counsel's strategy was only partially correct, missing that his counsel insinuated that B.M.K. was coerced by the police into making the allegations – not that she fabricated them of her own volition.  *See* ECF Doc. 8 at 101-106.  The Warden states that this was not the strategy.  ECF Doc. 6 at 55.

However, the distinction between counsel's analogy that the police gave B.M.K. the "blueprint" for her allegations (*see* ECF Doc. 6-3 at 1601-1610) and Kudla's characterization of the strategy as asserting that B.M.K. was coerced into making the allegations we need not address.  Even assuming defense trial counsel acted unreasonably by not presenting an expert witness with the recorded interview, Kudla's Ground Four claim fails because he cannot show that he was prejudiced by his counsel's decision.  *Strickland*, 466 U.S. at 687.  Kudla "produced no evidence that his attorneys would have located an expert who could have supported his defense."  *Drake v. United States*, No. 21-6162, 2022 U.S. App. LEXIS 21464, at *8 (6th Cir. 2022) (unpublished).  Although Kudla identifies studies from which he surmises an expert could testify similarly, the only thing he offers to support the claim that an expert would *actually* testify consistently with those studies is his own bare assertions.  As a result, he cannot show that he was prejudiced by the omission of an unidentified, theoretical expert's testimony.  *See id.* Because Kudla has not met his burden of demonstrating that he would have been prejudiced by

his appellate counsel's failure to raise his claim, Kudla's Ground Four claim fails for lack of merit.

### B.  Ground One

In his Ground One claim Kudla asserts that his appellate counsel was ineffective for failing to adequately investigate his case.  ECF Doc. 1 at 5.  He contends that his appellate counsel, specifically, should have investigated the admission of impermissible expert testimony (*i.e.*, the *Boston* violations alleged above).  ECF Doc. 1-14 at 86-93.  In his petition, Kudla refers to his attached Answer to Question 11(a)(5) (ECF Doc. 1-2), for further issues he asserts his counsel should have investigated; it identifies Grounds Two to Four, and that:

> The manifest weight of evidence argument could have (and should have) been better supported and argued [including proof of actual innocence] when the court was asked to sit as the thirteenth juror on pages six and seven [of his application to reopen].

ECF Doc. 1-2 at 1.  In the attachment, Kudla also references five arguments he included in a "rough draft" of the proposed assignments of error for his application to reopen, which reiterated the grounds above, adding a claim for prosecutorial misconduct.  *See* ECF Doc. 1-2 at 1-2.  In the attachment containing the rough draft, Kudla noted the prosecutor's use of "God" in his closing argument and identified numerous alleged misstatements of facts or evidence, which he claims the prosecutor made during his rebuttal arguments.  *See* ECF Doc. 6-1 at 321-328.

The Warden treats Kudla's Ground One argument as only addressing Grounds Two to Four from his petition and responds to the claim based on the merits of those grounds.  *See* ECF Doc. 6 at 28-30.  In his reply brief, Kudla reiterates his arguments as to the *Boston* violations.  ECF Doc. 8 at 27-29.

Although "[c]ourts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more

44

aspects of the case and when that failure prejudices his or her client." *See Parrish Towns v. Smith*, 395 F.3d 251, 258-59 (6th Cir. 2005).  However, "[a]n attorney is not required to present a baseless defense or create one that does not exist." *Krist v. Foltz*, 804 F.2d 944, 946 (6th Cir. 1986).  In fact, the Sixth Circuit has held that "a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material." *See Kimble v. Valentine*, No. 21-5079, 2021 U.S. App. LEXIS 25639, at *8 (6th Cir. 2021) (citing *Hutchison v. Bell*, 303 F.3d 70, 748-49 (6th Cir. 2002)) (unpublished).

Should the court prefer to decide Kudla's procedurally defaulted Ground One claim on the merits, I recommend that his Ground One claim be denied as meritless.  At its heart, Kudla's contention is that his appellate counsel's investigation was inadequate because his counsel disagreed with Kudla's assessment of the strength of the arguments.  Kudla does not identify any evidence his counsel did not have that he should have investigated; rather he states he provided support to his counsel for these claims, but his counsel determined not to include them on the appeal.  *See generally* ECF Doc. 1; ECF Doc. 1-14.  Because Kudla's claim attacks his appellate counsel's strategic choices rather than the actual investigation of the claims, Kudla cannot show that his counsel performed deficiently based on a failure to review evidence that Kudla himself provided.  *See Kimble*, 2021 U.S. App. LEXIS 25639, at *8.  Thus, Kudla cannot meet either prong of the *Strickland* standard.

I recommend that Kudla's Ground One claim be denied as meritless because he has not demonstrated the requisite prejudice and disagreement with counsel is does not prove that counsel failed to meet the objective standards required of attorneys under the Sixth Amendment.

## V.  Motion to Expand the Record

Petitioner Gregory S. Kudla, *pro se*, filed a motion to expand the record to include five photographs (State Exhibits 4, 5, 11, 15, and 23) and a video-recorded interview of the victim (Defense's Exhibit A).  ECF Doc. 9.  Kudla asserts that the photographs are relevant in determining whether his appellate counsel was ineffective in challenging the manifest weight of the evidence against him at trial, in part because counsel failed to dispute B.R.K.'s testimony, and the pictures would go to show that she could not have heard bedsprings in the other room (implying that he was sexually assaulting her sister).  ECF Doc. 9 at 2-4; ECF Doc. 1-14 at 55, 71.  He also argues the video-recorded interview of B.M.K.'s interview with police is relevant, referring to his petition's contention that his trial counsel was ineffective for failing to consult an expert and having the expert testify at trial concerning B.M.K.'s interview.  *See* ECF Doc. 1-14 at 102-124; ECF Doc. 9 at 4.

Kudla's motion was denied as to Exhibit 11, and the court ordered the Warden to provide State Exhibits 4, 5 15, and 23 and Defense Exhibit A or respond to Kudla's motion to expand, the Warden filed a response opposing the motion.  *See* ECF Doc. 11; Docket Entry for December 7, 2021.

Under Habeas Rule 7, federal courts have discretion to "direct the parties to expand the record by submitting additional materials related to the petition."  Rules Governing § 2254 Cases, R. 7(a).  Such materials may include "letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record."  *Id.*, R. 7(b).  However, our discretion to expand the record is tempered by our inability to consider evidence not presented before the state courts when we determine the merits of a claim that the state courts

addressed on the merits.  *Cf. Moore*, 708 F.3d at 780-84 (noting that expanding the record to include evidence that was not before the state courts could conflict with AEDPA's requirement that state prisoners first present their claims to state courts).

Because I recommend that Kudla's claims be denied as being procedurally defaulted, and Kudla's requested exhibits and the videotaped interview either support his challenges to the credibility of witnesses or are unnecessary for the resolution of his Ground 4 claim, Kudla's motion to expand the record is DENIED.  *See* Rules Governing § 2254 Cases, R. 7(a).

## VI.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), this court will grant a certificate of appealability ("COA") for an issue raised in a §2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right.  *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020).  A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

If the Court accepts my recommendations, Kudla will not be able to show that the Court's rulings on his claims are debatable among jurists of reason, because all of Kudla's claims are procedurally defaulted or meritless.  Because of jurists of reason would not find debatable that relief is unavailable on any of Kudla's claims, I recommend that no COA issue in this case.

## VII.     Conclusion

Accordingly, I order that Kudla's motion to expand the record (ECF Doc. 9) be DENIED. Further, because Kudla's claims are procedurally defaulted, I recommend that his claims be DISMISSED and his petition for writ of habeas corpus be DENIED.  In the alternative, each of Kudla's claims could be DENIED for lack of merit.  I also recommend that he not be granted a COA.

Dated: January 31, 2023

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report & recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections or filing incomplete objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, at *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).